# United States Court of Appeals
## For the Eighth Circuit
_____

No. 25-2351
_____

Wells Fargo Bank N.A., as Securities Intermediary

*Plaintiff - Appellant*

v.

Ameritas Life Insurance Corp.

*Defendant - Appellee*
_____

Appeal from United States District Court
for the District of Nebraska - Lincoln
_____

Submitted: March 17, 2026
Filed: July 30, 2026
_____

Before SHEPHERD, ERICKSON, and GRASZ, Circuit Judges.
_____

SHEPHERD, Circuit Judge.

Vida Longevity Fund (Vida) bought an insurance policy insuring the life of senior citizen Jerry Freid (the Policy). After Freid died, Appellee Ameritas Life Insurance Corp. (Ameritas)—the successor in interest to the company that issued the Policy—refused to pay Vida the policy benefits, contending that the Policy was void as stranger-originated life insurance (STOLI). Appellant Wells Fargo Bank N.A. (Wells Fargo), in its capacity as Vida's securities intermediary, sued Ameritas in an

attempt to enforce the Policy. The district court[1] granted summary judgment in Ameritas's favor on all of Wells Fargo's claims. Wells Fargo appeals. Having jurisdiction under 28 U.S.C. § 1291, we affirm.

I.

An insurance producer and broker named Michael Binday ran a brokerage firm called R. Binday Plans and Concepts. In 2012, Binday and an insurance agent working with him—James Kevin Kergil—were indicted for defrauding insurers through a STOLI scheme.[2] After a jury trial, Binday and Kergil were convicted of mail fraud, wire fraud, and conspiracy to commit mail and wire fraud. Evidence adduced at that trial confirmed the Policy was part of their scheme.

Binday's STOLI scheme involved soliciting seniors to purchase life insurance policies so that third-party investors could acquire them downline. Binday obtained life expectancy reports for these seniors, which he then sent to the investors. The investors would then evaluate whether a policy on a given senior's life would make sense. After an investor was secured for a policy, Binday or his staff would cause a trust to be created to own that policy. Binday enlisted his cousin, Michael Block, to serve as trustee for some of the trusts. Block served as trustee for approximately 25 to 30 Binday-originated policies, including the Policy. He understood Binday's strategy to involve (1) finding seniors who did not need or want insurance, (2) locating investors who could front policy premiums for approximately two years, and (3) relinquishing the policies to such investors in satisfaction of their loans or selling the policies to third-party investors to cover the loans. Block also understood

---

[1] The Honorable Susan M. Bazis, United States District Judge for the District of Nebraska.

[2] "A STOLI policy is one obtained by the insured for the purpose of resale to an investor with no insurable interest in the life of the insured—essentially, it is a bet on a stranger's life." United States v. Binday, 804 F.3d 558, 565 (2d Cir. 2015), abrogated on other grounds by Ciminelli v. United States, 598 U.S. 306 (2023).

that Binday used his trusts as a "workaround" to "get over the problem" posed by anti-STOLI laws.

An entity called HM Ruby funded premiums on some of the policies that Binday originated through his STOLI scheme. HM Ruby structured its premium-finance loans so that insureds had no financial risk. Specifically, HM Ruby's scheme gave policy owners a "put" option. That is, the policy owners could require HM Ruby to acquire the policies at the loans' maturity dates in satisfaction of the loans. The upshot was that HM Ruby could not pursue the insured personally in the event of default, and that the only collateral for its loans was the policies themselves. When HM Ruby embarked on its premium-finance program, it did not wish to acquire the financed policies itself. Wayne Himmelseim, an HM Ruby general partner, expected that most of these policies would be sold to other investors to cover HM Ruby's loans, and that HM Ruby would only acquire around 30% of the policies itself.

According to HM Ruby analyst Adam Weidenbaum, by August 2008—before the Policy was issued—HM Ruby began actively seeking to acquire the policies it funded. Other HM Ruby insiders testified that HM Ruby switched its strategy some time later. Ultimately, HM Ruby acquired roughly 90% of the policies it financed. Binday's understanding was that HM Ruby's program was designed exclusively to generate policies for outside investors (rather than help insureds fulfill legitimate estate-planning objectives). In July 2007, when an HM Ruby account executive suggested that Binday's firm stop using its standard trust agreements and have "each client . . . retain an attorney to look over the trusts and potentially make their own trusts," Binday strenuously objected. He replied that this would "be a roadblock that w[ould] jeopardize deals." He further noted:

> I object to your objections. They are only reasonable from an estate planning standpoint. Your program is not designed for estate planning, so don't kid us about it. We expect every policy that goes through HM to get sold in two years.

In 2008, Freid was 72 years old and retired. Years earlier, he sold his home in Pennsylvania for $365,000 and moved to Iselin, New Jersey, where he rented a townhome. As of 2008, Freid did not own any real estate. He also drove a used car, and, as far as his daughter, Eileen DeBeuchamp, knew, did not own any stocks or bonds. DeBeuchamp, who later managed Freid's finances and administered his estate, estimated that Freid's net worth could not have been more than $500,000. At the time, Freid was the insured under three life insurance policies, totaling $275,0000. But he could not afford—and eventually stopped paying—the premiums on these. When Freid passed away in 2020, he had no more than $20,000 in his bank account.

In 2007, Binday started laying the groundwork for procuring a policy on Freid's life. His firm requested Freid's medical records and commissioned life expectancy reports. In December of that year, Binday created the Jerry Freid Irrevocable Trust (the Trust), using his form trust agreement. The trust agreement included a New Jersey choice of law clause and indicated it was signed and notarized in New Jersey. It named Binday's cousin Block as trustee. Further, the trust agreement authorized Block to purchase insurance on Freid's life, stated that Freid "specifically intend[ed] that the Trustee retain and continue to hold any life insurance policy transferred to or secured by the Trust at any time, without any obligation to diversify any such investment," and gave Block "sole and absolute discretion" to "use trust income to purchase life insurance policies" and to "exercise all rights of ownership and control contained in the policies." The trust agreement named DeBeuchamp as the Trust's beneficiary, though she was not aware at the time that the Trust existed.

On August 14, 2008, Binday's firm submitted the application for the $4 million Policy (the Application) on Freid's life to the Union Central Life Insurance Company (Union Central). The Application specified that the Trust would own this policy, and that the Trust had an address in Iselin, New Jersey. It also stated that Freid lived in Iselin, New Jersey, and that the signatories, including Block, Freid, and Kergil, had signed it in Iselin, New Jersey. Binday's firm submitted the

-4-

Application on New Jersey insurance forms. The illustration Binday's firm presented for the Policy was likewise prepared on New Jersey forms. Further, Binday's firm used Kergil's New Jersey licensing information to acquire the Policy and noted via email to Union Central that it sought a New Jersey policy.

The Application represented that Freid's net worth was $4.45 million. When DeBeuchamp learned about this representation during this litigation, she "laughed out loud." She testified that an underlying Financial Statement Block had purportedly prepared made several patently false claims about Freid's assets—for instance, that he owned approximately $2 million in real estate and $1.5 million in "cars, furniture, jewelry, art, etc." She also explained that Freid could not have possibly afforded the Policy's annual premium.

Also accompanying the application was a Statement of Policyowner and Agent Intent. That Statement—signed by Block as trustee, Freid as the insured, and Kergil as agent—answered "no" to the following questions:

> 1. Do you presently intend to assign or sell the life insurance policy for which you are applying?
>
> 2. Have you spoken with an individual or company offering to pay you for your life insurance policy?
>
> 3. Have you spoken with an individual or company offering you "free" or "no cost" insurance?
>
> 4. Do you anticipate having to complete, or have you completed, any loan papers in connection with your purchase of this life insurance policy, or are the premiums otherwise being financed in any way?
>
> 5. Have you ever sold or assigned a life insurance policy that you owned to a third party?

But Kergil never met with Freid, nor did he know if Freid had any legitimate purpose for seeking the Policy. He later testified that he signed the paperwork associated

with the Application simply because someone from Binday's office asked him to do so. That would not have been unusual. Indeed, Binday's assistant, Tracey Robinson, testified that Binday requested that his staff answer questions like those posed on the Statement of Policyowner and Agent Intent in the negative as a matter of course. For his part, Block only met with Freid once. And that was years after the Application had been filed and the Policy had been issued—as far as Block recalls, he encountered Freid in 2011 when Freid came to his office to pick up a check. Block admits that he does not know why Freid applied for the Policy and that he did not do any estate planning for Freid.

Central Union issued the Policy on September 8, 2008. The Policy was printed on New Jersey forms, and specified an annual premium of $177,000. It contained a provision entitled "CONFORMITY WITH LAWS" that read, "This policy is subject to the laws of the state where the application is signed." And it named the Trust as its beneficiary.

Also on September 8th, Block executed a Credit Agreement with HM Ruby on the Trust's behalf, under which HM Ruby agreed to loan the Trust funds for, among other things, premium payments. The Credit Agreement specified a 27-month loan term, meaning that the loan's maturity date post-dated the Policy's two-year contestability period by three months. But it did permit the Trust to request a five-year maturity-date extension. The same day, Freid executed HM Ruby's form Consent and Acknowledgment Agreement (the C&A Agreement). The C&A Agreement provided that, in the event of a default on the loan, HM Ruby would be the "sole owner and beneficiary of the Policy." It also noted that the premium-finance loan could be coupled with a "put" agreement, and if that "put" were exercised, neither Freid nor his estate would "have any rights associated with the premium financing provided." The C&A Agreement required Freid to acknowledge a New York State Department of Insurance Opinion that concluded that a transaction coupling a premium-finance loan with a "put" option violated New York's insurable interest laws because the arrangement "involve[d] the procurement

of insurance solely as a speculative investment for the ultimate benefit of a disinterested third party."

Five days later, on September 13, 2008, Freid executed a personal guaranty committing to repaying the loan balance if the Trust defaulted. But the Trust and HM Ruby simultaneously executed a "put" agreement (Put Agreement), obligating HM Ruby to purchase the Policy from the Trust for the outstanding loan balance if the Trust either (1) exercised the "put" option the Put Agreement created or (2) failed to pay the loan, in which case the "put" option would be deemed exercised.

After the Policy's two-year contestability period elapsed, HM Ruby bought the Policy from the Trust. In connection with the sale, Robinson completed an Insurable Interest and Premium Finance Questionnaire (the Questionnaire), which Block and Binday then signed. The Questionnaire certified that the Policy's purpose was estate planning, that Freid and the Trust had not intended to sell the Policy when it was purchased, and that neither Freid nor the Trust discussed the possibility of a viatical or life settlement (i.e., a sale of the Policy to a third party) before the Policy was issued. According to Robinson, these representations were false. She testified that this was "because these HM deals were not pitched to clients like Freid as being for estate planning; no actual estate planning was done on HM deals; and the whole purpose of these deals was for HM to pay the premium and for HM or another investor to take the policy after two years or so."

Vida ultimately purchased the Policy as part of a bundle of other insurance policies. Many of the policies in this bundle—the Policy included—were premium-financed by HM Ruby. During its diligence process, Vida described the block of policies it was considering purchasing as "horrendous" and perhaps "the worst overall block [it] had ever looked at." And some Vida insiders viewed the HM Ruby associated policies as "premium finance loan[-]to[-]own crap." Still, Vida decided to take a chance on them.

After Freid died in July 2020, Vida, via Wells Fargo, tried to collect on the Policy. Ameritas, which by that point had succeeded to Union Central's interests, refused to pay. Wells Fargo sued Ameritas. Its operative complaint asserts two causes of action: breach of contract (Count 1) and bad faith breach of the covenant of good faith and fair dealing (Count 2).

Ameritas moved for summary judgment. The district court granted Ameritas's motion, dismissing both of Wells Fargo's claims. It concluded that New Jersey law applied, and that, under New Jersey law, the Policy was STOLI and thus void ab initio. And because it concluded that the Policy was void, the district court reasoned that Ameritas neither breached its terms nor acted in bad faith in refusing to pay Vida the Policy benefits. Wells Fargo appeals.

II.

First, Wells Fargo contends that the district court erred in concluding that New Jersey law applied. Wells Fargo argues that—at a minimum—there are disputed issues of material fact that preclude applying New Jersey law. "We review a district court's grant of summary judgment de novo, including its interpretation of state law." Metro. Prop. & Cas. Ins. Co. v. Calvin, 802 F.3d 933, 937 (8th Cir. 2015) (citation omitted). "Summary judgment is appropriate when, viewing the facts in the light most favorable to the non-movant, there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law." Id. (citation omitted). Further, "[o]n appeal, we review the district court's application of [a] state's choice of law rules de novo." Baxter Int'l, Inc. v. Morris, 976 F.2d 1189, 1195 (8th Cir. 1992).

Because Wells Fargo sued Ameritas in Nebraska, Nebraska's choice of law rules determine what state's substantive laws apply to this dispute. See id. ("Federal district courts apply the choice of law rules of the state in which they sit when jurisdiction is based on diversity of citizenship."). Under those rules, parties' choice

-8-

of law elections are typically honored, unless contrary to public policy. First Nat. Bank in Mitchell v. Daggett, 497 N.W.2d 358, 363 (Neb. 1993).

Wells Fargo argues that the Trust and Union Central made a choice of law election in the Policy, because the Policy states that it is "subject to the laws of the state where the application [was] signed." Wells Fargo further contends that "the state where the application [was] signed" is a disputed, material fact for summary judgment purposes. When deposed in this case, Block testified that he was "almost 100 percent sure [he] wasn't in New Jersey" when he signed the Application for the Policy and that he was "positive for [his] own sake that [he] never signed a policy outside of Florida." In Wells Fargo's view, a jury could find that Block signed the Application in Florida, in which case Florida law would govern.

We disagree with Wells Fargo that the state where Block signed the Application is material. The problem with Wells Fargo's argument is that it construes the Policy's "CONFORMITY WITH LAWS" clause as a choice of law clause. But that provision is not a choice of law clause. It is, as it states, a conformity with laws clause. See AEI Life LLC v. Lincoln Benefit Life Co., 892 F.3d 126, 129, 132-33 (2d Cir. 2018) (distinguishing between choice of law clauses, which "reflect the parties' intent to select the law of a specified state" and conformity with laws clauses, which operate to "excis[e] a provision of an insurance policy that conflicts with or is voided by state law and replac[e] the provision with the prevailing state statute or judicial rule of law" (citation omitted)); Wilmington Tr., Nat'l Ass'n v. Ameritas Life Ins. Corp., No. 1:23-CV-02097-VMC, 2024 WL 3551131, at *4 (N.D. Ga. May 15, 2024) (concluding that a conformity with laws provision identical to the Policy's conformity with laws provision was, in fact, a conformity with laws provision); Ameritas Life Ins. Corp. v. U.S. Bank, Nat'l Ass'n, No. 22-CV-623-JLH, 2023 WL 9419169, at *6 (D. Del. Oct. 5, 2023) ("[T]he caselaw overwhelmingly suggests such a provision [as Ameritas' conformity with laws provision] is not a choice of law clause."). Because the conformity with laws clause is not a choice of

law clause, the fact that Block signed the Policy Application in Florida (even if true) does not mean that Florida law applies.[3]

Where, as here, the parties do not make a choice of law election, Nebraska courts generally look to Restatement (Second) of Conflict of Laws § 188 (A.L.I. 1971) to resolve conflict-of-law issues in contract cases. See, e.g., Johnson v. U.S. Fid. & Guar. Co., 696 N.W.2d 431, 441 (Neb. 2005). But Nebraska courts also recognize that "[w]hile § 188 sets out the general contacts to consider in contract cases involving conflict of law disputes, §§ 188 through 197" of the Restatement are instructive "with regard to specific types of contracts." Mertz v. Pharmacists Mut. Ins. Co., 625 N.W.2d 197, 203 (Neb. 2001). Section 192 of the Restatement, which applies to life insurance contracts, explains that:

> The validity of a life insurance contract issued to the insured upon his application and the rights created thereby are determined, in the absence of an effective choice of law by the insured in his application, by the local law of the state where the insured was domiciled at the time the policy was applied for, unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the transaction and the parties, in which event the local law of the other state will be applied.[4]

---

[3]Wells Fargo contends that in separate litigation, Ameritas' 30(b)(6) corporate representatives testified to the effect that the Policy's conformity with laws clause is a choice of law clause. Even assuming Wells Fargo was correctly characterizing this testimony, the deponents' purported admissions would not change the analysis. See S. Wine & Spirits of Am., Inc. v. Div. of Alcohol & Tobacco Control, 731 F.3d 799, 811 (8th Cir. 2013) ("A 30(b)(6) witness's legal conclusions are not binding on the party who designated him[.]"), overruled on other grounds as recognized in Sarasota Wine Mkt., LLC v. Schmitt, 987 F.3d 1171 (8th Cir. 2021).

[4]Strictly speaking, the Policy was issued to the Trust, not Freid personally. That distinction is not relevant for purposes of § 192. See Mayo v. Hartford Life Ins. Co., 354 F.3d 400, 405 (5th Cir. 2004) (observing that Texas law would govern the terms of a life insurance policy taken out by a Texas-domiciled individual, even if that individual did so through a Georgia trust).

-10-

Restatement (Second) of Conflict of Laws § 192 (A.L.I. 1971). Section 6 of the Restatement in turn states:

> When there is no . . . [statutory] directive [directing a choice of law decision] the factors relevant to the choice of the applicable rule of law include
>
> (a) the needs of the interstate and international systems,
>
> (b) the relevant policies of the forum,
>
> (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
>
> (d) the protection of justified expectations,
>
> (e) the basic policies underlying the particular field of law,
>
> (f) certainty, predictability and uniformity of result, and
>
> (g) ease in the determination and application of the law to be applied.

Restatement (Second) of Conflict of Laws § 6 (A.L.I. 1971). Nebraska courts recognize that, generally, in contract cases, "the most compelling factor under § 6 is the protection of the parties' justified expectations." Johnson, 696 N.W.2d at 442.

Here, it is undisputed that Freid, the insured, was domiciled in New Jersey when his trust applied for the Policy. Wells Fargo has not established that any state—let alone Florida—had a more significant relationship to the transaction and the parties. The only contact Florida has with this dispute is that the trustee who signed the application for the policy may have happened to do so in Florida. And significantly, the record makes clear that everyone involved with the Policy expected that New Jersey law would apply. Binday's firm submitted the Application on New Jersey documents. The Application confirmed that the insured risk would be located in New Jersey and was submitted using Kergil's New Jersey credentials. Binday's firm told Union Central that it sought a New Jersey policy. And Union Central

-11-

ultimately issued the Policy on New Jersey forms.  Until Block indicated during this litigation that he may have signed the Application in Florida, nobody thought Florida had anything to do with the Policy.  Applying New Jersey law—and not Florida law—is consistent with the parties' justified expectations.

In line with the principles of § 192, we conclude that New Jersey law governs the Policy's validity.[5]  The district court did not err in reaching its New Jersey choice of law result.

III.

Next, Wells Fargo contends that the district court erred in concluding that the Policy was void as a matter of law.  In Wells Fargo's view, even if New Jersey law governs, genuine disputes of material fact precluded summary judgment on its claims.

New Jersey's insurable interest statute proscribes "proc[uring] or caus[ing] to be procured" a life insurance contract "unless the benefits under that contract are payable to the individual insured or his personal representative, or to a person having, at the time when that contract was made, an insurable interest in the individual insured."  N.J. Stat. Ann. § 17B:24-1.1(b).  Under New Jersey law, an individual has an insurable interest in (1) "his own life," (2) "the life . . . of another

---

[5]We note that the Nebraska Supreme Court apparently has not yet had occasion to apply § 192—which again deals with choice of law issues with respect to life insurance policies.  However, given that it has applied Restatement provisions bearing on choice of law for other specific types of contracts, see Mertz, 625 N.W.2d at 201, 203 (adopting § 196, which deals with contracts for personal services), we predict that it would follow § 192, see Leonard v. Dorsey & Whitney LLP, 553 F.3d 609, 612 (8th Cir. 2009) (explaining standards for predicting state law).  But even if we applied the more general choice of law principles of § 188, which the Nebraska Supreme Court has expressly adopted, we would reach the same result.  See Restatement (Second) of Conflict of Laws § 188(b) (A.L.I. 1971) (listing relevant contacts for choice of law disputes in contract cases).

individual if he has an expectation of pecuniary advantage through the continued life . . . of that individual," and (3) "the life . . . of another individual to whom he is closely related by blood or by law." Id. 17B:24-1.1(a).

There is no dispute that the Policy technically complied with these requirements at its inception. The Policy's ultimate beneficiary, via the Trust, was Freid's daughter—a person with an insurable interest in Freid's life. See Sun Life Assurance Co. of Canada v. Wells Fargo Bank, N.A., 208 A.3d 839, 850 (N.J. 2019) (recognizing that an irrevocable trust naming the testator's daughter as its beneficiary has an insurable interest in the testator's life). But that does not end the analysis: New Jersey law also proscribes end-runs against its technical insurable interest requirements.

Indeed, in 2019, the New Jersey Supreme Court held that STOLI policies—that is, policies in which the insurable interest requirement appears to have been satisfied at the moment of purchase, but that were "procured with the intent to benefit persons without an insurable interest in the lives of the insured"—violate New Jersey law. Id. at 841, 849. In reaching that conclusion, it noted that "[i]t would elevate form over substance to conclude that feigned compliance with the insurable interest statute—as technically exists at the outset of a STOLI transaction—satisfies the law" and that "[s]uch an approach would upend the very protections that the statute was designed to confer and would effectively allow strangers to wager on human lives." Id. at 841. The New Jersey Supreme Court further concluded that STOLI policies are "void ab initio." Id. at 841.

The summary judgment record does not permit a reasonable trier of fact to conclude that the Policy was anything other than STOLI as that term was used in Sun Life. Ameritas supported its summary judgment motion with ample evidence that HM Ruby procured the Policy or caused the Policy to be procured either so HM Ruby could acquire it, or so that it could be sold to a third-party investor to satisfy HM Ruby's premium finance loan to the Trust. Either way, that arrangement runs afoul of New Jersey law. See id. at 849 (holding that life insurance policies procured

-13-

with the intent to benefit persons without an insurable interest in the life of the insured violate New Jersey public policy).

Ameritas's summary judgment evidence establishes that the Trust did not purchase the Policy for estate planning purposes. Freid was not a wealthy man: he had no need for, nor could he afford, a $4 million life insurance policy. Whatever Freid's net worth was, it did not remotely approach $4.45 million, as represented in connection with the Application. Freid's daughter, who administered Freid's estate and assisted Freid in managing his finances, laughed out loud when informed of that figure. She estimated that his net worth could not have been more than $500,000. The Policy's annual premiums ran to $177,000. But Freid could not even afford the premiums on his three other (significantly smaller) life insurance policies. And ultimately, it is undisputed that Freid was never required to, nor did he pay, a dime in premiums on the Policy.

Moreover, HM Ruby did not finance the Policy to help Freid with his estate planning objectives. As Binday candidly explained in an email exchange with HM Ruby, its program was "not designed for estate planning" and Binday expected every policy going through HM Ruby's program "to get sold in two years." HM Ruby did not expect that Freid would or could repay its premium-finance loan. Although it required Freid to execute a purported personal guaranty, that guaranty was illusory. In reality, HM Ruby's loan was no-recourse, because the Trust could "put" the Policy to HM Ruby in satisfaction of the loan, or, if the Trust defaulted, the "put" option would be deemed executed. HM Ruby knew that the structure of its financing deals could present a STOLI problem: it required Freid to acknowledge a New York State Department of Insurance Opinion saying as much. Given Freid's limited resources, it was clear at the outset that the Trust would either have to surrender or sell the Policy. And HM Ruby ultimately did purchase the Policy, shortly after its contestability period elapsed.

In sum, Ameritas's summary judgment evidence shows that the Policy was procured at the outset not for the benefit of any person with an insurable interest in

Freid's life, but rather for the benefit of HM Ruby or some other investor. Or, in other words, that the Policy was STOLI.

Wells Fargo attacks the admissibility of the Binday email, which it describes as the "cotter pin" to Ameritas's summary judgment case. It contends that this email is inadmissible hearsay. At summary judgment, "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). But the contents of the Binday email likely could be presented in admissible form. First, the email may be admissible as a statement against interest. See Fed. R. Evid. 804(b)(3). The email essentially admits that Binday was facilitating fraudulent STOLI transactions for HM Ruby—thus exposing Binday to criminal liability. And Binday may be unavailable at trial—when Ameritas filed a motion to compel to enforce a subpoena in a miscellaneous action, Binday repeatedly referenced his Fifth Amendment privilege against self-incrimination and noted that compelling his deposition would be a "waste of time" in view of that privilege. If Binday elected to testify, he could speak to the structure and purpose of the HM Ruby transactions. And if he testified contrary to the statements he made in his email, Ameritas could impeach him with it. One way or another, the contents of the Binday email could be presented in a form that would be admissible in evidence.

Wells Fargo also points to evidence in the record that it contends raises a fact issue as to the intent underlying the Policy at the time it was issued. Specifically, Wells Fargo notes the representations Block, Freid, and Kergil made in the Statement of Policyowner and Agent Intent to the effect that the Policy was intended for estate planning purposes and not intended at the outset for resale, and the similar representations Binday and Block made in their Questionnaire responses when the Trust sold the Policy to HM Ruby. But none of Wells Fargo's purported evidence raises a genuine dispute of material fact.

There is no indication that Binday, Block, Freid, Kergil, or anyone else was telling the truth on the forms they executed. To the contrary, all the evidence shows

that the form signatories were lying about Freid's and the Trust's purposes. Binday's assistant Robinson testified that Binday instructed his staff as a matter of practice to lie on such forms. The signatories also lied about Freid's net worth on the Application, vastly overstating it. And again, Freid clearly could not have afforded the premiums—premium financing is the only way he could have paid them. Wells Fargo says that Ameritas asked the district court—and is asking us—to weigh credibility.[6] But there is nothing to weigh: zero evidence indicates that the representations Wells Fargo relies on are true. No reasonable jury could believe Freid's Trust was anything other than a straw purchaser, or that the Policy was anything other than unlawful STOLI under New Jersey law. See Danker v. City of Council Bluffs, 53 F.4th 420, 423 (8th Cir. 2022) (recognizing that the summary judgment inquiry depends on what a "reasonable" jury could find).

IV.

For the foregoing reasons, we affirm the judgment of the district court.

_____

_____

[6]Relatedly, Wells Fargo attacks the district court's statement that it was "not inclined to check its common sense at the door." We do not share Wells Fargo's view that the district court "appl[ied] its 'common sense' to brush aside genuine factual disputes." We read the district court's order as correctly recognizing that the ultimate question at summary judgment is whether "a *reasonable* jury could return a verdict for the nonmoving party," Danker v. City of Council Bluffs, 53 F.4th 420, 423 (8th Cir. 2022) (emphasis added) (citation omitted), and that to avoid summary judgment, "[t]he nonmovant 'must do more than simply show that there is some metaphysical doubt as to the material facts,'" Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (citation omitted).